IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 16-_____ |
| | ) |
| NATALIE REED PERHACS | ) |

## FACTUAL RESUME

The defendant, **NATALIE REED PERHACS**, admits the allegations of Count One of the Information.

## ELEMENTS OF THE OFFENSE

**NATALIE REED PERHACS** understands that in order to prove a violation of Title 18, United States Code, Section 371, as charged in Count One of the Information, the United States must prove:

*First*: Two or more persons in some way agreed to try to accomplish a shared and unlawful plan to violate the Anti-Kickback Statute, the elements of which are:

(1) at least one co-conspirator knowingly and willfully offered, paid, solicited, or received any remuneration, directly or indirectly, overtly or covertly, in cash or in kind;
(2) the remuneration was offered, paid solicited, or received, at least in part, to induce or in exchange for the purchasing, leasing, or ordering of any good, item, or service covered by a federal healthcare program; and
(3) the good, item, or service was paid for, in whole or in part, by a federal healthcare program.

*Second*: The defendant knew the unlawful purpose of the plan and willfully joined in it;

*Third*: During the course of the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the Information; and

*Fourth*: The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

## OFFENSE CONDUCT

1

Defendant, **NATALIE REED PERHACS**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **PERHAC's** plea of guilty. The statement of facts does not contain each and every fact known to **PERHACS** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

A.   **Physician Pain Specialists of Alabama**

Between January 2011 and the date of their arrests on May 20, 2015, Xiulu Ruan, M.D. and John Patrick Couch, M.D. jointly owned and co-directed a pain management clinic named Physician's Pain Specialists of Alabama ("PPSA"), which had two clinic locations in Mobile, Alabama. Located adjacent to one of the PPSA clinics was C&R Pharmacy, which was also jointly owned by Dr. Ruan and Dr. Couch.

At PPSA, Dr. Ruan and Dr. Couch treated several thousand patients whose services were paid for by both private and federally-funded health insurance providers. Of the thousands of patients treated at PPSA, very few had cancer.

On or about March 26, 2012, a company identified herein as "Company A" rolled out their instant release fentanyl drug Subsys, a Scheduled II Controlled Substance. On April 25, 2012, Dr. Ruan wrote his first prescription for Subsys to a patient whose federally-funded health insurance provider was billed $1,312.29 for this prescription. Dr. Couch also wrote his first Subsys prescription on April 25, 2012 to a patient whose private health insurance provider was billed $6,307.94 for this prescription. Once Dr. Ruan and Dr. Couch began prescribing Subsys in April 2012, they quickly became two of the top Subsys prescribers in the entire nation.

At certain points during 2012 and 2013, Dr. Ruan was the #1 prescriber of Subsys in the entire United States. Due to the enormous volume of Subsys prescriptions Dr. Ruan was writing, certain individuals within Company A referred to Dr. Ruan as one of Company A's "*three*

2

*whales.*"

Dr. Ruan and Dr. Couch broadly prescribed Subsys off-label to non-cancer patients, and to certain non-cancer patients whose health insurance providers continued paying for the drug. For example:

> Between September 11, 2012 and April 1, 2015, Dr. Ruan wrote 31 prescriptions for Subsys to a non-cancer patient in her 20s. This patient's federally-funded health insurance provider was billed $179,286.141 for these Subsys prescriptions.
>
> Between December 13, 2012 and May 18, 2015, Dr. Couch wrote 28 prescriptions for Subsys to a non-cancer patient in his 30s. This patient's federally-funded health insurance provider was billed $465,062.57 for these Subsys prescriptions.

### B.   Conspiracy to Pay Illegal Kickbacks to Dr. Ruan and Dr. Couch

The objective of this conspiracy was for Company A to illegally pay kickbacks in the forms of speaking fees and honorariums to Xiulu Ruan, M.D. and John Patrick Couch, M.D. to induce, and in exchange for, their prescribing Subsys to PPSA patients.

On January 2, 2012, Company A received FDA approval for Subsys, a Schedule II Controlled Substance. Within the first month, Company A executives had already identified Dr. Ruan as an important prospective prescriber. By October 2012, Dr. Ruan had become the number one Subsys prescriber in the nation.

Beginning in August 2012, Dr. Ruan and Dr. Couch were both paid to conduct speakers programs on behalf of Company A. While the purported purpose of the programs was for Subsys prescribers to convince other doctors to prescribe Subsys, the speaker programs, in reality, were a façade used by Company A to funnel illegal kickback payments to high volume Subsys prescribers

In late 2012, **PERHACS**, who worked for a durable medical equipment company in the Southern District of Alabama, met Dr. Ruan and Dr. Couch. By early November 2012, Dr. Ruan

had developed a certain affection for **PERHACS**. In an e-mail sent on November 7, 2012, Dr. Ruan asked **PERHACS**, *"Well, I want to ask you a personal question and hopefully you would not be offended. Are you involved with someone now? .... You don't have to answer any of these if you do not feel comfortable."*

Thereafter, Dr. Ruan went out of his way to try to get **PERHACS** hired as a sales representative with a pharmaceutical company by reaching out to individuals he knew at three different pharmaceutical companies and explained why they should hire **PERHACS** for their sales force. In February 2013, Dr. Ruan asked **PERHACS** if he could pay her to be his personal speech coach so that he could improve his public speaking skills.

During the first quarter of 2013, a Company A sales representative continued to set up paid speakers programs for Dr. Ruan. In turn, Dr. Ruan continued to prescribe high volumes of Subsys off-label to non-cancer patients at PPSA. Due to the concern that Dr. Ruan would stop prescribing Subsys if his sales representative, who had been promoted, finding a suitable replacement for his sales representative who would please Dr. Ruan was of paramount importance.

On March 26, 2013, Dr. Ruan sent an e-mail to **PERHACS** explaining that he recommended her to Company A:

> *Natalie, I recommended you to .... the regional director of [Company A]. I talked to him today and there might be a position open for you. I highly recommended you to him. I think the chance for you to be taken is greater than 90%. They have very competitive compensation package based on sales. I think it is a job on which you can show your capability. .... will contact you shortly. BTW, I am a national speaker as well as on the advisory board for this company. Dr. Couch is also a speaker for this company. We both know this product well. I hope you can get it this time.*

Dr. Ruan sent another e-mail recommending that Company A hire **PERHACS** to be his new Subsys sales representative. On April 1, 2013, one day before **PERHACS** was supposed to meet with about the Company A sales representative position, Dr. Ruan sent **PERHACS** the an e-mail explaining very basic product information regarding Subsys.

4

On April 2, 2013, **PERHACS** was hired to be the personal sales representative for one of Company A's most important prescribers in the entire country at that time — Dr. Ruan. She was not hired because of her experience or her knowledge of Controlled Substances. **PERHACS** was hired to induce, and in exchange for, Dr. Ruan continuing to prescribe Subsys to PPSA patients.

**PERHACS** began with Company A on April 5, 2013 and received limited training in the product, sales, or compliance. On April 8, 2013, **PERHACS** was placed in charge of a sales territory which included both Dr. Ruan and Dr. Couch. **PERHACS's** primary responsibility at Company A was to increase the volume of Subsys prescribed by Dr. Ruan and Dr. Couch. She accomplished this by numerous means, including, but not limited to: (1) handling insurance prior authorizations for PPSA patients prescribed Subsys; (2) identifying patients who had been at the same strength of Subsys for several months and recommending that Dr. Ruan or Dr. Couch increase the patient's prescription strength; and (3) setting up and attending paid speaker programs.

Initially, **PERHACS** was very successful in boosting the Subsys prescription volume for both Dr. Ruan and Dr. Couch. Since she was involved in the prior authorization process, **PERHACS** was aware of the diagnoses of the PPSA patients receiving prescriptions for Subsys. **PERHACS** knew that a vast majority of the PPSA patients to whom Dr. Ruan and Dr. Couch prescribed Subsys did not have breakthrough cancer pain. This was also known to individuals within Company A, who received the information from **PERHACS** to generate the prior authorizations to send to patients' healthcare insurance providers.

October 2013 was the highest volume Subsys prescribing month at PPSA. During the 23 days PPSA was open that month, Dr. Ruan and Dr. Couch combined to write a total of 110 prescriptions for Subsys, 33 of which were written for patients who had previously never been prescribed Subsys. Nearly all of these prescriptions were written off-label to non-cancer

patients. All of these prescriptions were filled at C&R Pharmacy which then billed federally-funded and private health insurance providers a total of $572,626.62.

**PERHACS** also set up and attended speaker programs for Dr. Ruan and Dr. Couch. **PERHACS** was aware that not only were meals paid for by Company A during these speaker programs, but that the doctors also received honorariums for "speaking" on behalf of Company A. **PERHACS** did not know how much Ruan and Couch were being paid or how they were paid. Throughout her time as a sales representative for Dr. Ruan and Dr. Couch, **PERHACS** scheduled approximately one speaker program per doctor per week. There were some occasions during which Dr. Ruan or Dr. Couch actually spoke to other prescribers about Subsys during these Company A-paid lunches and dinners. However, for a majority of the speaker programs, Dr. Ruan and Dr. Couch either (1) repeatedly spoke to the same prescribers about Subsys, (2) spoke to just the PPSA staff about Subsys, or (3) did not speak about Subsys at all. The purpose of the speaker program was not to promote Subsys, but rather funnel kickbacks to high-volume Subsys prescribers.

Even outside her responsibilities with Company A, **PERHACS** did anything possible to keep Dr. Ruan and Dr. Couch happy so that they would continue to prescribe Subsys. This included, but was not limited to joining Dr. Ruan's health products pyramid scheme at his request, and writing a fraudulent online "patient review" under an alias so as to increase Dr. Ruan's online ratings. **PERHACS** had a strong financial incentive to get Dr. Ruan and Dr. Couch to continue to prescribe Subsys and to turn a blind eye to illegal kickbacks being paid by Company A to Dr. Ruan and Dr. Couch. Despite earning a base salary of only $40,000.00 per year, commissions from off-label prescriptions written by Dr. Ruan and Dr. Couch resulted in **PERHACS** making over $700,000.00 between April 2013 and the doctors' arrests on May 20, 2015.

During the time **PERHACS** worked for Company A the following overt acts were committed, among others,

1. On or about May 9, 2013, Dr. Couch received check number 11090 from Company A, payable to John Patrick Couch, in the amount of $3,200.00.

2. On or about February 6, 2014, Dr. Couch held a speaker program at Fuego, a restaurant in Mobile, Alabama. This speaker program was hosted and attended by **PERHACS**.

3. On or about February 13, 2014, Dr. Couch received check number 1920 from Company A, payable to John Patrick Couch 1099, in the amount of $1,600.00.

4. On or about April 25, 2014, Dr. Ruan held a speaker program at Osaka Japanese Grill in Mobile, Alabama. This speaker program was hosted and attended by **PERHACS**.

5. On or about May 1, 2014, Dr. Ruan received check number 3057 from Company A, payable to Xiulu Ruan XLR Properties, LLC in the amount of $6,000.00.

6. On or about October 31, 2014, Dr. Couch received check number 5091 from Company A, payable to John Patrick Couch 1099, in the amount of $3,750.00.

In total, between April 25, 2012 and the date of his arrest on May 20, 2015, Dr. Ruan wrote at least 1,812 prescriptions for Subsys to 428 different patients. During this same time period, Dr. Couch wrote at least 872 prescriptions for Subsys to 190 different patients. All of these 2,684 Subsys prescriptions were filled at C&R Pharmacy, which was owned by Dr. Couch and Dr. Ruan. To induce, and in exchange for, the 2,684 Subsys prescriptions written by Dr. Ruan and Dr. Couch, Company A hired **PERHACS** at Dr. Ruan's specific request and paid the doctors hundreds of thousands dollars in alleged speaking fees.

AGREED TO AND SIGNED.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: _____February 17, 2016_____

_____
Deborah A. Griffin
Assistant United States Attorney

Date: _____February 17, 2016_____

_____
Christopher J. Bodnar
Assistant United States Attorney

Date: _____2/17/2016_____

_____
Vicki M. Davis
Assistant United States Attorney
Chief, Criminal Division

Date: _____2/17/16_____

_____
Natalie Reed Perhacs
Defendant

Date: _____2/17/16_____

_____
T. Jefferson Dean III
Attorney for Defendant